Case number 12-2074, Todd Rochow v. Life Insurance Company of North America. Oral argument not to exceed 20 minutes per side. Mr. Scharf for the appellant. Your Honors, it's Mr. Blumenfeld for the appellant. Oh, I'm sorry. Yes. That's no problem at all. Thank you. May it please the Court, and good afternoon, Your Honors. My name is Jeremy Blumenfeld on behalf of the appellant Life Insurance Company of North America, also referred to in the briefs as LINA. With me at counsel table is Courtney Griffin. With the Court's permission, I'd like to reserve three minutes of my time for rebuttal. In 2007, this Court affirmed an award of disability benefits to Mr. Rochow under 29 U.S.C. 1132a1b. LINA has paid approximately $900,000 in attorney's fees and benefits to Mr. Rochow pursuant to that provision. In 2012, the District Court awarded an additional $3.8 million in disgorgement of profits on a breach of fiduciary duty theory. The only fiduciary breach was the denial of benefits, the same arbitrary and capricious denial of benefits that had already been addressed by this Court in 2007 and by the District Court in its 2005 order. Did the District Court have subject matter jurisdiction? To issue the post-judgment award, I would say no, it did not, Your Honor, because of the final judgment rule and the mandate rule. So your contention is that Rochow won, the Court of Appeals did have jurisdiction, that there was a final judgment by the District Court? Correct. There was a June 24, 2005 judgment which, pursuant to its terms, ordered and adjudged that the case shall be dismissed. And that was a final judgment, yes. How was it a final judgment if damages hadn't been adjudicated? Well, the answer to that, Your Honor, is this is a benefits case, and in a benefits case, in the first instance, where the dispute is whether the plaintiff is entitled to benefits or not, the appropriate decision by the District Court is to adjudicate whether benefits are appropriate or not, but not to determine the amount of those benefits. That had never been considered by Lina in the first instance. Who decides the amount of benefits, then, and when? So after an adjudication, as what happened here, the case should go back to Lina, to the extent there's any dispute about the amount of benefits, it would be considered as a claim for benefits, just like in the first instance, if Mr. Rochow had made a claim for benefits, and Lina said, yes, you are entitled to those benefits, but here is the amount, it's $100 a month, and Mr. Rochow thought that he was entitled to something more than that, that would be required to go through the claims and appeal process in the same way. Counsel, if that's the case, if Lina withholds benefits, and there's a finding that withholding of benefits was a bad faith act, if your theory is correct and the claimant is sent back to Lina for a determination of the damages, are you saying then that all the claimant would be entitled to would be the benefits that he should have gotten 10 years earlier, 7 years earlier, and maybe interest? Well, let me address that in two ways, Your Honor. First of all, the district court, before the first appeal, made no findings, no suggestion that there was anything bad faith. There was an arbitrary and capricious denial of benefits. I'm saying, I'm giving you a hypothetical. I didn't use the word hypothetical, but clearly. So under my hypothetical situation. Sure. Because you're saying it should go back to Lina, they make the determination, but in my hypothetical, if there has been a bad faith denial of benefits or some kind of a malicious withholding, it goes back to Lina to make that determination. Isn't that kind of a perverse and odd situation for them to do the calculation? I don't think so at all, Your Honor. And if you look at the Supreme Court's decision in the Frommert case, it talks about what happens when the administrator of a plan makes a mistake and calculates benefits incorrectly. And what the court said in that case is the administrator's determination on remand is still entitled to deference. Now, it may be that the case goes back to Lina and is adjudicated, just as if it were adjudicated in the first instance, as a claim not about whether the plaintiff is entitled to benefits or not, because the district court addressed it. How does that address the remedial provision of the statute? Because under your theory, I guess the only remedy is really to give the benefits that the court has determined that the person is now entitled to. That's absolutely right, Your Honor. And if you look at the Supreme Court's decision in Verity Court v. Howe, the Supreme Court said that Section 1132a1b of the statute is the enforcement provision, and I want to make sure I get the language right, that specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of planned documents and the payment of claims. That's 1132a1b, which entitles here Mr. Rochelle to the benefits and to prejudgment interest, but not to any disgorgement of profits remedy. So who would decide prejudgment interest in your theory? Would the prejudgment interest be decided on remand to Lina? Well, certainly that could be an appropriate vehicle for it. What I'll say, Your Honor, is that there are two different schools of thought, and the courts sometimes handle those things differently in terms of determining the amount of the benefits. And what I was trying to do in answering Judge Griffin's question was address the circumstance of what happens if the district court doesn't set the amount. Certainly there are other cases where district courts in the first instance do say, here's the amount of the benefits, and here is an appropriate prejudgment interest rate. And that certainly does happen. That's not what happened here. Are you saying that's improper when that happens? No, I'm not saying that's improper. I'm saying what I am saying, however, is that in a circumstance where a district court does not set the amount of the benefits, that's still a final judgment when the district court enters what the district court judge did here, which is a judgment which purported to dismiss the action and ended the case in the district court. But you're saying then once the amount is determined by the insurer, that goes through the whole appellate process again is what you're saying? It goes through the claims and appeal process just like in the first instance if that had been the only issue that the parties disagreed about was the amount of the benefits as opposed to whether benefits were due in owing.  But equitable remedies do not go through lineup, right? Well, it is true that there are equitable remedies under 1132A3, and those in many circumstances at least don't require exhaustion, except when they involve the adjudication of benefit claims or the payment of benefit claims because those are claims that are supposed to be brought under 1132A1B with respect to the amount of the benefits. What about with respect to the amount of any other equitable remedies? When what you're talking about is a claim for benefits, and the fiduciary duties that attach to a claim for benefits, those are all enforced under 1132A1B, and so the remedies are set forth in 1132A1B. And if there are additional breaches beyond just an arbitrary and capricious evaluation under planned documents, where is that remedy? I think that remedy typically does fall to the court to decide, and that's what this court addressed in the Gore case, for example, where it specifically said that the claim for benefits and the adjudication of whether benefits were properly denied or not is governed by 1132A1B, but the claim for breach of fiduciary duty was separate and unrelated. It had to do with misrepresentations about the terms of the plan instead of whether benefits were due and owing. What if the misrepresentation had been about the benefit itself? What about a Hill claim? Well, the Hill case is very different again because this court in Hill specifically focused on the fact that it wasn't the individual benefit claim that was being addressed under 1132A3. It was... Because it had already been won, right? Well, the individual benefit claim was adjudicated under 1132A1B. The 1132A2 claim dealt with ongoing claims handling procedures because that plaintiff and other plaintiffs could have similar problems in the future under that plan because of plan-wide claims administration problems. There's no allegation of that here. There's no finding by the district court of that here, and no suggestion that that was any part of plaintiff's claim here. There were just dual findings at this court level, correct? There was a finding of a breach of the plan documents, A1B, and a breach of fiduciary duty, correct? And to be clear, the breach of fiduciary duty was solely based on the arbitrary and capricious denial of benefits. That was the only basis for that finding. And what the district court did was simply refer to its earlier ruling that the earlier decision arbitrarily and capriciously denying benefits also was a fiduciary breach. And plaintiffs in their appellate brief can see it as much. If you look to page... So we agree that 1132 has a A1B benefits claim and an A3, and we agree that A3 under AMARA has a significant available set of equitable remedies, correct? I would agree that there are certain equitable remedies available under certain circumstances, correct, Your Honor. Is there anything in the structure of 1132 that would tell you that you believe evidences that A1B and A3 are mutually exclusive? Well, yes, but to be clear, they're not mutually exclusive in that the same person can bring both claims. But you can't bring both claims based on the arbitrary and capricious denial of benefits. And I think the best example of that is perhaps the statute, the subsection that appears in the middle, which is 29 U.S.C. 1132 A2. That provision, for example, specifically allows for a disgorgement of profits remedy. There would be no purpose in having that specific and explicit disgorgement of profits remedy in 1132 A2 if you could get that relief under 1132 A3 under the safety net, as the Supreme Court referred to it in Verity. And in fact, if you look at Verity, what the Supreme Court said was 1132 A1B is the specific enforcement provision for fiduciary breach claims regarding the payment of claims and the interpretation of benefit plans, but that 1132 A3 was the enforcement provision for other violations of other fiduciary obligations. So the question before us is whether you may state a claim for benefits that also includes another fiduciary breach. Let's take, for example, someone who makes an application for a disability benefit and the payment of that benefit is delayed for 10 years. And during that time, the disabled individual loses his home or is unable to provide for assisted living. Is it your position that because it is a benefits claim and no matter the reason why the company denied that claim, there is no other relief available other than payment of the benefits after 10 years? What I would say, Your Honor, is first of all, you can get prejudgment interest to accommodate a circumstance like that. And the reality is that there is no remedy that would be afforded that would account for the emotional harm that the person might have suffered because of losing their house or anything along those lines. But ERISA doesn't provide for those remedies because ERISA provides for the separate breach of the duty of the trustee or fiduciary to handle benefit claims solely in the interest of the plan beneficiaries. Let's say that 10-year delay was occasioned by self-dealing of the fiduciary. That fiduciary put that money in his or her pocket. In that situation, wouldn't you say that there is an additional fiduciary breach claim that might be remedied under A-3? Well, there are two separate things, I guess, going on there, Your Honor. And I should say first, there's no evidence, there's no argument, there was no finding by the district court of anything like that. The only thing that existed here was the arbitrary and capricious denial of benefits. And that's the only thing that the district court based its conclusions on. But to answer your question, 1132 A-1B provides for certain remedies. And that's the answer in that context. 1132 A-2 talks about other remedies with respect to the misuse of plan assets. And in that context, certainly you can get discouragement of profits where there is a misuse of plan assets. And that's consistent with what existed at the common law because at common law, fiduciary duties attached to trust assets. And that's a payment to the plan. Correct. Is your position that one of those claims can never state a claim that involves the inappropriate withholding of wrongful conduct? That's the distinction that I see in Verity when it talks about the adequacy of the remedy and Amara when it talks about what remedies can be had under equitable rights is that if you have this additional wrongful action on the part of a fiduciary, then is it your position that A-3 can never remedy that for the beneficiary who is the individual that has suffered at the hands of that impropriety? What I would say, Your Honor, is 1132 A-1B is the remedial provision for that portion of the statute. And there is no distinction in the case law under ERISA between a very arbitrary and capricious denial of benefits or just a slightly arbitrary and capricious denial of benefits or under the de novo standard, a decision that simply is incorrect. In point of fact, have you found any case in the United States at the district or the court of appeals or the Supreme Court level where somebody was denied benefits under the arbitrary and capricious standard, was awarded then benefits under A-1B, and was awarded monetary benefits under the equitable remedy section of A-3? No. This would be the first case in the United States at any level to recognize that arguable double recovery? That's correct, Your Honor. Counsel, would it have been proper to, after the award, award the interest separately? It would have been proper in the district court, if the plaintiffs had asked for it, the district court had discretion to award pre-judgment interest. Now, pre-judgment interest has been the case to say that this is a very flexible concept, that it's intended both to compensate and also not to punish, but to make sure that there is no unjust enrichment. I think the focus generally is on the make-whole relief of the statute, but you are correct that one of the factors the courts sometimes consider in that balancing is the interest. So if this had been an interest calculation where the court listens to all the evidence and says, yeah, pre-judgment interest at this point under the statute was only this amount, but this was also a period in which insurance companies were making a lot of money and were going to look at the record and come up with a figure that will both compensate the plaintiff for the loss of money and also not punish, but assure that there is no unjust enrichment. Now, could the court have done that? The court could have done that, but there are limits on what the court can do. It can't be too little and it can't be too much. And providing a windfall to the plaintiff is something that this court has said cannot be the result of that. Hasn't this court also said that if you do not take away and require the breaching fiduciary to disgorge the profits that were earned on the plaintiff's money, then that is a windfall to the plan or a windfall to the fiduciary? I don't believe the courts have addressed it in that circumstance, and I think the conversation is really about the remedial nature of the statute and the make-whole relief of the statute in those terms. Well, we've said that in other cases, but have we ever said that in the ERISA context when there is adequate relief under A1B? I'm sorry, and I thought the question was directed to whether prejudgment interest under A1B might be available under similar kinds of circumstances. At this point, you'll have to explain what she's asking, but I interpreted it to say, are there cases that say you can make whole under equitable relief? And, of course, the answer to that is yes. Has that ever been applied in the ERISA context in a situation where one is given the benefits wrongfully withheld under A1B? Again, not that I'm aware of, Your Honor, and I think if you look at the Schumacher v. A.K. Steel case, that's one of the more recent cases from this court talking about the amount of prejudgment interest, and it talks about the different factors that are supposed to be considered. None of them is a return on equity profits analysis along the lines of what the district court did here. Was there any award of prejudgment interest here? There was not an award of prejudgment interest here, and while it could have been awarded, certainly the plaintiffs never appealed from that determination to this court, either in the first appeal or in this subsequent appeal. So they haven't requested that this court do anything with respect to the district court's failure to award any prejudgment interest. Do you object to our sending it back to the district court to consider that in the first instance? I think the answer to that, Your Honor, is as long as you can get over the nature of the final judgment and their failure to appeal, I think that's the only hurdle that they have to overcome, and I don't know why. There wouldn't be a hurdle from your client objecting to our doing that? Well, I guess what I would say, Your Honor, is that the case has been decided and appealed, and I think the same final judgment rules that apply. If you look at the Supreme Court's decision in Briggs, it's an old case, but it specifically talks about the availability of prejudgment interest and how in circumstances where prejudgment interest is not awarded, the district court can't go back and award it after the proceedings are concluded. I think the problem with that argument is when this went back, as I understand it, there was a discussion guided by the court between the parties as to what issues still remained. You both agreed that the issue of disgorgement of profits and prejudgment interest was still a live issue, so it seems odd to then say final judgment rule, you can't talk about these things, because you had agreed they were issues. Now once the district court then chose disgorgement, correctly or incorrectly, obviously the district judge at that point isn't going to do prejudgment interest. So you're seemingly saying even though Rocha won at that stage in the remand on disgorgement, he then had to appeal the failure to have ruled on prejudgment interest. Can you explain why that would make sense? Well, I think the basic rule is that if you don't get relief that you are seeking, then there is supposed to be some sort of action by the litigant in order to pursue the remedy that you're entitled to. Let's assume that there are alternative ways of seeking relief. Let's just assume for a second that you could get both. You ask for both, you get one, you're not going to appeal the other. If the one you got is then taken away, why wouldn't you then still have retained the right to seek the one you didn't get? I understand what you're saying, Judge McKeegan. I understand how that might be appropriate under the right circumstances. I guess when you're dealing with two statutory enforcement provisions and the failure to award relief under one statutory provision, the fact that the dollars might be fungible, I don't know that that changes the nature of the failure to award the relief under 1132A1B. Back to Judge Sutton's question, if that's right then you wouldn't have a principled objection if this got remanded back based upon a deficiency in the disgorgement order to allow at least Rocha to renew his request for pre-judgment interest. I certainly understand what it is that you're asking, Your Honor, and I guess I would have to see what it was that the court did in order to understand the implications of it. You wouldn't disagree that our decision in Rovarcheck, Judge Nelson's decision in Rovarcheck and Sweet v. Consolidated Aluminum Corporation, that both of those make clear, for example, Rovarcheck, that the rate of return actually realized by TRW on the relevant funds seems an appropriate way to avoid unjust enrichment. Certainly that's what that case said, and I think if you look at that case and if you look at the A.K. Steele case, they all talk about the return on assets as an appropriate measure of what the pre-judgment interest would be, and what happened here, the same dollars are at stake. The same dollars of returns were yielded, but the district court and the plaintiff's expert took money out of the denominator. In other words, returns were earned on a certain group of assets, and then in order to calculate the percentages, certain aspects of that were taken out of the denominator, which is what yielded those higher numbers. What I can say, Your Honor... The bottom line is, assume we agree with you that this was incorrectly calculated. What you're suggesting and saying is that an award of pre-judgment interest could still provide disgorgement of profits as a make-all remedy. Well, it could provide up until a certain point. Yes, that's correct, Your Honor, but not to the level, not disgorgement of profits per se, but an award of pre-judgment interest could have essentially the same effect. There's something in the docket number 33, stipulation and order regarding awarding interest. What was that? I believe, Your Honor, what that dealt with is there was a period of time during which the parties were negotiating certain things, and there was at least an acknowledgment that certain time periods would not be charged as against LINA with respect to pre-judgment interest because those were delays that were occasioned by things on the plaintiff's side as opposed to the defendant's side. The other important consideration about pre-judgment interest versus a disgorgement-type remedy, pre-judgment interest is one thing, but it ends, as its name suggests, upon the judgment, after which post-judgment interest really comes into play as opposed to pre-judgment interest. Unless the Court has any further questions, I see my time is up, and I'd like to spend the rest of my time on rebuttal. Thank you. Good afternoon. Eric Scharf, the Scharf Appellate Group. On behalf of John and Todd Rochow, the personal representatives of the estate of their father, Daniel Rochow. In 1998, Judge Cole, you authored an interesting opinion called U.S. versus $515,000 in U.S. currency. Judge Boggs and Judge Keith were on that panel with you. It was interesting because the IRS wrongfully detained money and wanted to remit just the principal, and you wrote something that I find both somewhat funny and somewhat enlightening in the current situation. It's funny in the sense that such a disparate setting would yield something that's so interesting. You noted that common sense is particularly illuminating in considering this issue. If the government seized, for example, a pregnant cow, and after the cow gave birth, the government was found not to be entitled to the cow, it would hardly be fitting that the government return the cow but not the calf. And this actually builds on a published decision that Judge Boggs issued on the Ninth Circuit, oddly enough. And that's really what you've got going on here. LINA kept our cow for as long as they possibly could. Well, what if the calf is prejudgment interest? And to a certain extent, the calf can be prejudgment interest. Smaller calf, right? That's exactly right, Your Honor. It's exactly right. And to take the metaphor one step further... Tell us 3.8 versus what. How does it break down in this case? 3.8 is what was gotten through disgorgement approach. What would you get through prejudgment interest? The exact same 3.8 under Barczyk versus TRW that Judge Strange discussed. But how do you get 3.8 when the remedial goal of ERISA is to place the plaintiff in the position he or she would have occupied but for the defendant's wrongdoing? I don't think... How is that even measured in terms of that remedial goal by what the wrongful withholder does with the money? And the reason I'm asking is let's assume for a second that the insurance company in this case just made some really crummy investments or it was a bad economic time. And not only did they not make any money but they lost money. Now you're still going to claim your entitlement to prejudgment interest which would be based on a reasonable amount of interest to restore the plaintiff to his or her proper position, right? Not under an accounting theory. Under an accounting theory you can't get anything if the fiduciary is in a lost position. In that situation I think what would happen is you'd... Under prejudgment interest you can. It's not measured by what the defendant does, how well they do or don't do? Only by dint of the rule that fiduciaries are held to invest in a prudent way and guarantee a minimum return. Most states, if not all states, and I believe the Uniform Trust Code has a provision that locks a fiduciary... But under ERISA you can't be right in what you're saying. Under ERISA you would always get prejudgment interest. And it's not going to turn on whether the insurance company was making a profit or not. I'm really shocked that that wasn't a simple answer. I thought that's what he said. I thought you said prejudgment interest. You're saying there would be times where you would get zero prejudgment interest. Oh, okay. So you'd get a minimal amount and I would think that the way you would do that would be by analogy to comparable laws governing fiduciaries that... What you said is that the fiduciary would invest it in reasonable, prudent returns. The problem here is that you wanting 26% a year, which unless you invest with Bernie Madoff, no reasonable prudent fiduciary is going to get. I mean, isn't that kind of the problem from your side, which is why should your client get 26% because it happened that the insurance company did well generally. He didn't take your money and put it in a pot where somebody else paid him 26%, right? That just happened to be how well they did that year. And it wasn't even in any one year. It was 26%. Okay, I understand. For seven... Well, it's 26% for seven years, which is even more, but I guess that's my problem is... And I did write that California case and we were trying to say that the person should have done either as well as they actually did, because the government put it into an account, or as he could have done. Your man could not have taken that money and made 26% for seven years. You don't claim that, do you? There's certainly no evidence to that effect, Your Honor. So then the question is, did they really make 26% on his money? They didn't take his check and put it in a bank that paid 26%. That's exactly right. To use simple numbers, making up numbers, they had $400 million in assets and they made $100 million that year. Call it 25%, okay? The question is, if they'd only had $399, if they didn't have his million, wouldn't they have still made the $100 million? Because it was what the whole company made. They didn't make it on his assets. Your Honor, this is an argument that Lina could have raised. What you're getting at is the concept of marginal capital. That's really what you're getting at. And you're saying, why not treat Rochelle's money as if it can be segregated to a particular tranche of Lina's equity? And it can't. Not under equitable principles, and here's why. You're right. Our money had no identifiable character. When I say our money, there's no concept such as our money. There's no identifiable race or particular subcomponent of Lina's portfolio or business dealings. It is Rochelle's money. It wasn't earmarked. It wasn't segregated. It wasn't separately accounted. So the question is, why not engage in a marginal capital analysis and ask, would that last million or so have made much more money? The reason why is, A, that's not the way equity works, and we cited cases for this, and Lina's never even argued on this. We hired a business school professor geared up to dispute exactly that point. Really, what that point is, that's a tracing fiction. It's similar to the rule in Jessup's Bag or the concept of heavy money. It's saying, let's consider the money to have occupied a particular tranche or portion of the fiduciary or the trustee's accounts. But what you'd be doing is tracing into the least valuable aspect of the business. It would be as if the person who supplied capital always got the worst end of it because a basic business theory tells you that the last dollars into a company are going to be the least earning. What we did is we got an average blended rate of what Lina made on all of its equity, and we took great pains to try to identify, to the greatest possible extent, the narrowest understanding of where the money was. That's why we hired an eminent business school professor with a Harvard PhD, and we looked at this and said, well, could you consider it marginal capital? Shoot, one other alternative, and equity would actually slightly favor this alternative, would be to trace it into the highest value product. To say, given that the fiduciary, the trustee, commingled the asset, let all of its individual characteristics... Out of curiosity, this 3.8 million, I asked you this earlier, what would it have been under conventional prejudgment interest terms, and you went right back to 3.8 saying you'd be entitled to the same thing. I'm curious what you would get if you think about this in prejudgment interest terms outside of ERISA. In other words, the norm that you get, whatever, 3% or 4%. I mean, it fluctuates, and there's pretty conventional ways to handle this outside ERISA. I'm not asking you to give up any arguments here. I'm just curious what the difference would have been. 3.8 versus 400,000, 300,000? I don't know. I'm just curious. Prejudgment interest, I think you should start with this understanding. Prejudgment interest is, in and of itself, an equitable remedy. And it's awarded in the discretion of the court using equitable principles. So you're going to say anything from 0 to 3.8? Or higher, Your Honor, based on equitable principles. We have cases, not that we're bound in an en banc, but, for instance, the Ford versus Uniroyal pension, which identifies a prejudgment interest rate that should be applied in the circumstances of that case. The district court applied it. We then affirmed on abusive discretion grounds. So the argument that you're making in favor of the disgorgement is an A3 remedy, not a prejudgment interest remedy, right? That's not exactly correct, Your Honor, because prejudgment interest now has to arise under A3 following Amara, because all you can do under A1 is enforce the plain terms of the plan. Now, in Ford v. Uniroyal, which was, of course, your case, so I'm sure you know it well, Ford v. Uniroyal, this court upheld, as not an abusive discretion, a 9% interest rate. There's no question. But this concept of excessive interest rates, I think we need to go back to that, because I think that's what Judge Sutton's getting at, too, thinking that this is a large number, and hence, maybe it's excessive. What is the circuit view as excessive? Excessive obviously is in the eye of the beholder. Lina makes enormous returns, and I can guarantee you there's no bean counter at Lina saying, gee, we're making too much profit. It's excessive. So excessive in this context is greater than the fiduciary earns, and that's exactly what the court held in Rybarczyk v. TRW that Judge Strange was quoting earlier. But what seems ironic to me about that argument is there is a focus by the district judge in this case about the money not being segregated. So let's say they had just taken this money. They knew it was in dispute. They plugged it in a savings account that's currently making, what, 1% or something, ignoring the argument that that was not a prudent action by a fiduciary. They're still earning 26% on all of their other money, but simply by the device of putting it in a separate account, then all of a sudden you get 4% or whatever it is. That's exactly right. That's fair in your opinion? Yes. Really? And it's equitable, and it's fully consistent with... So an accounting device will then solve this problem for all insurance companies. Absolutely. Well, it's not a problem. Before we spend the whole time on this, I want to ask you the same question that I asked your other counsel, and that is, have you been able to find any case, anywhere, any level, where if you got benefits under A1... I forgot the number. A1B. B, any court has ever awarded monetary relief, however you want to describe that, under A3? The best single example is Parkview Reliance Standard Life. Then there are plenty of cases on pre-judgment interest being awarded under A3. I'm not asking about pre-judgment interest now. Right, I should have qualified the question to exclude pre-judgment interest. I think we all agree that if you don't get this equitable relief, you're still entitled to pre-judgment interest. But have you found any case for disgorgement of profits in a case where the person got benefits under the arbitrary capricious standard? The best single example is Parkview Reliance Standard Life, and there the disgorgement amount was orders of magnitude less vast than here. So in one sense, we are precedent-setting or groundbreaking in the amount, but not in the legal theory. In Parkview Reliance Standard Life, the Eighth Circuit went through and analyzed the equities and the equitable doctrine of equitable accounting and said that it was appropriate under the catch-all. Again, the amount was vastly less. They call it interest or disgorgement? Both. I know that's an unsatisfying answer, but what they did is, literally the plaintiffs threw up their hands and said, this is beyond our ken to figure out what the earnings of the insurance company is. We can't do it. We can't show a profit. And the court said, well, in light of that, we will deem the profit to be some objective measure of interest, and that's what they used. So the only substantial difference between Park and us is that we took on what seems like the Herculean task of showing what the profit is. And I'd like to point out, too, we did that without discovery. We did that by buying from the National Association of Insurance Commissioners the blue books or annual statements of line-up and painstakingly analyzing them to show what the return on equity is. You know what the return was in Park when you said the court said, well, we'll give you a standard rate? I don't know what the percentage was, but I can tell you that the amount was $692. And in Judge Moore's example, I believe she said 9%. Roughly, if you had gotten 9% for seven years, you would have had something in the range of $800,000 or $900,000. Is that about right? As long as it was compounded monthly. Correctly. Counsel, it sounds to me like this discussion of interest as if its return on equity is sort of mixing two different concepts. In ordinary business accounting, there's a difference between return on equity and how much you pay for a loan. And that's usually what we're talking about when we talk about interest. An enterprise borrows money, pays whatever the current going rate is for money, and that's how much the money is worth. It may make a lot more, but at the same time, it's enduring a risk. So that risk is gambled, if you will, or taken. And that's something that the people who are equity participants in the enterprise take that risk and get the gain. And they get the money where they promised to pay regardless of the risk, and they pay interest on that. So it just seems like the idea of turning interest into return on investment is sort of mixing apples and oranges. How do you respond to that? We were an equity participant, Your Honor. We supplied unrestricted equity capital. So is anybody who lends money to the company. No, they're not, because they have a defined rate of return and they have a contract. Right, that's what I'm saying. So in effect, you can say we were equity, but another way of looking at it is this was an enforced loan or an involuntary loan. But when you think of the value of money, you think of how much you could get for it on the market if you were just selling the money, regardless of whether the investment was good or bad. This is how much it costs to borrow money these days, which is how pre- and post-judgment interest is usually tied to. But to tie it to the success of an enterprise whose equity investors were taking a risk associated with that enterprise seems to take the whole concept a whole conceptually different level. It's saying we're going to treat the value of the money as the value that someone could get if they're successful in a risky operation. That isn't normally what we talk about when we're talking about the value of money. We were forced at gunpoint right into that risky operation. Well, but isn't what Judge Rogers said exactly what happened in that Ninth Circuit case? In that case, we said, if the government had not wrongfully taken your money, the government would have gone out onto the market and borrowed it. I think what Judge Rogers is saying is that if LINA had not withheld your money and if they had needed money at all, they would have gone onto the market and borrowed it at whatever the market rate was, which certainly wasn't 26%. Something we looked at. I appreciate the clarification. That's something we looked at with Professor Croson in extreme detail. And one of the most interesting things that came out of the discovery was LINA never borrows money. We were going to ask about that and see what their borrowing rate was in case it became relevant to the whole analysis. But LINA doesn't borrow. That almost causes the problem to me, which is, in what sense did your money add to something? Is there any real proof that their profit, their total profit, would have been any different whether they took your money or didn't? That was the question about entrepreneurship. If LINA only did one profitable thing that year, it bought a lottery ticket and it won $400 million in the lottery. There are lottery ticket cases. But your money wouldn't have had anything to do with it. They would have bought the lottery ticket anyway. And what we did, and what the district court did, was apply a studied body of case law on equity and equitable accounting that asks what to do in a situation where money doesn't have an identifiable characteristic. It isn't earmarked. It isn't separately accounted. It isn't set aside. And there are a set of presumptions for how that works. But I thought, I mean, I think the import of these questions is you look at it from the side of Rothschild, the claimant. How do you make the claimant whole? And under your breath, it seems to me, you clarified it exactly. Involuntary lender or involuntary shareholder. It's very strange to think of prejudgment interest cases as about involuntary shareholders. It's just a really odd way to capture it. And I think that's the import of those two questions. And under your breath, that's exactly how you analyzed it. And I think you're right to analyze it that way. It's just an involuntary shareholder case. That's not how we think of prejudgment interest. It might be how we think of disgorgement of profits. But I add something to the mix here. Lina is a trustee. It's a fiduciary. It was charged with the sole mission of looking out for the welfare of Mr. Rothschild. It abused that discretion to earn this profit. There are special rules inherent to trustees and trusteeship that prevent... You're right. Absolutely. That means you have to make the 3B argument not as a proxy for prejudgment interest, a freestanding argument. And maybe you're right about that, but they're different. I think there are prejudgment interest cases that recognize the imperative of preventing unjust enrichment through prejudgment interest. And I agree. Oftentimes prejudgment interest is not going to extend to those concerns. But again, you're dealing with a trustee. Trustees can never profit through their discretionary situation. And that's exactly what Lina did. Was the initial summary judgment award by the district judge a final judgment, giving the first Rochelle I Court subject matter jurisdiction over the appeal? No. And in fact, as the underlying panel held, the June 24, 2005 judgment was not a final judgment because the court had not considered remedies and had more to do. That's at page 421. There's just no question it was not. Why didn't you object when they filed a claim of appeal? Because we understood them to be appealing solely the issue of whether Rochelle was entitled to benefits. They might have wanted to do that, but if there was an outstanding claim, they couldn't do it. I think they could if the decree is understood as a decree in equity to treat this person as disabled and pay them. Then there's appellate jurisdiction as an injunction. We should look at that as an injunction. I think so. Did you ever ask for one? Did you characterize it that way at any point? Below, I don't think we did. I think what we asked is, we said, treat us as disabled. The first case wasn't equitable at all. The first decree from Judge Tarnow was you denied benefits, you acted in an arbitrary and capricious way, and therefore you violated ERISA. They owe you benefits. That's an award of money. It's not equitable relief. I don't think it is, Your Honor. It's an order that the trustee is in breach of trust and should treat the individual as disabled and do everything for them that they're supposed to do. What Mr. Blumenthal pointed out is, okay, then we can administratively figure out what we should do for them. That's exactly what they did. When we came back from the Sixth Circuit after Rochelle won, we spent... There's not a word in Judge Tarnow's order about a breach of trust or a breach of fiduciary duty. He just says they acted in an arbitrary and capricious way. That's a different standard. How, if we go down this road, isn't every single denial of benefits a breach of fiduciary duty? No. There is a gap or room between the two. I believe most, if not all, the circuits have noted that sometimes arbitrary and capricious denial can be a breach of fiduciary duty, other times it isn't. And it may sit difficultly with the court members to think, well, what could somebody do that's arbitrary and capricious that wouldn't be a breach of fiduciary duty? Sometimes the administrator will test particular provisions of language in the statute, or they'll have a good-faith reason for objecting, say, to a new medical treatment or something like that. So it's not always a breach of fiduciary duty. Second, and this is critical, Leina wants to portray this as a monolithic requirement that every court engage in equitable accounting. It doesn't have to happen in every case. It happens when it is what economists would refer to as Kelder-Hicks efficient, a fancy way, I guess, of saying cost-effective. In our case, maybe the first case under ERISA where it's been cost-effective, because we had fully $910,000 in principal, and Mr. Blumenthal mistakenly... Other people are going to pick up on this theory. I don't think there's going to be a lot of restraint with this theory. The restraint comes in at the point of the district court, Your Honor. In a situation where the run of time, where the time horizon is only a year or two, the compounding effect isn't as great as it was in our case. In our case, we had compounding over 10 years. And we had a situation where the fiduciary was resisting even the most... where the trustee was resisting even the most basic efforts to understand what the actual earnings were. We went back to them immediately, and we wrote them a letter, and we said at status conferences, please tell us what the earnings were. At one point, it sounded like they were going to do so. Then they said no. We had to hire Professor Croson. We did that, and they came back with their response, which was, we'll actually be segregated, and we only earned $32,000. And that's why this had to happen. The accounting tested the factual waters of whether the money was actually segregated or not. Because if Lion was right about that, that would have formed a cap on prejudgment interest as well. Are you saying that if it was a small amount of money over a short amount of time, you shouldn't get it? Shouldn't get equitable accounting. Shouldn't get the nuanced factual inquiry that looks at exactly what the trustees...  Because it's not Helder-Hicks efficient. It's not cost justified. And as a general matter, prejudgment interest will do a good enough job as a proxy for the amount of the unjust enrichment. Could you be able to get both prejudgment interest and unjust enrichment amounts? You mean disgorgement? No. And that's why it's essentially an election of remedies situation. In this, we said that the most appropriate remedy was equitable accounting. In the alternative, at every time, we preserved our right to prejudgment interest. So it's one or the other. And a district court in their discretion has to weigh discretionary factors and decide whether to engage in the more factually nuanced process that we engaged in here. Mr. Sharp, one or the other. I mean, the general principle is that if legal remedies are adequate, that equitable remedies are not invoked. And here, the district court and the panel said even though the claimant here recovered all his actual damages under A1B, we're nevertheless going to allow equitable remedies on top of the actual damages. So here you really are arguing for a double recovery, are you not? It's not a double recovery. Well, you're conceding that he's made whole under the A1B damages, but he's entitled to extra damages on top of that. I'm not conceding that. All right, the prior panel said an award of both actual damages and disgorgement are allowed. Well, if he recovers actual damages under A1B, he's made whole, is he not? No, Your Honor. The profit belongs to the wronged beneficiary as a matter of right. It is our task. Don't you think Congress knew the principles that equitable remedies are not normally invoked if legal remedies are sufficient, and by writing equitable remedies into statute, intended the normal rule to apply? There's no question. Well, why would you think that you could get both adequate legal remedies plus equitable relief? Because the legal remedy isn't adequate to get us what we're owed. We are owed both the principle and the interest. We're owed the cow and the calf. Counsel, at that point, we've gone well over time. May I ask a question? One quick question, but we've got rebuttal and another en banc case coming. Can you just quickly explain what you understand to be the relationship between this plan and LINA generally? I think it's a situation where LINA uses the word plan when they should be using the word insurance policy. They're a trustee, but there isn't a larger plan at issue here. This is a one-time relationship between Mr. Rochau and LINA. Is that answering your question? So you're saying that there are no other monies under this policy or plan other than the money that was owed to Mr. Rochau? The insurance company certainly has other money. They have an enormous $5 billion portfolio. I'm not talking about that. I'm talking about under this plan or policy. It covered only him. Is that what you're saying? Well, actually, the policy was a group policy. It covered the other individuals at the company that Mr. Rochau founded and was the president of. Okay, so it's just a policy. It worked like any other insurance policy? With the exception that LINA was an ERISA-regulated trustee, was a fiduciary. So there was no corpus anyplace? There was no defined corpus. Oh, I see exactly what you're saying. No, it was not like the traditional, like a welfare trust where, say, a rich uncle leaves money in trust for a group of people or something like that. No, there was not. The insurance company pays the benefits out of its general corporate assets. Is that responsive to your question? I should wrap up, I think. Can I? No. I get the sense, Your Honors, you'd like me to be brief, and that's what I shall do. I'd like to start by talking about the question about whether the judgment was, in fact, a final judgment. And Mr. Rochau, in the first appeal, not only didn't object to that appeal and to appellate jurisdiction, but affirmatively represented in his appellate brief, along with LINA, that the judgment was, in fact, a final judgment. That's a decision on subject matter jurisdiction for us to decide. It is, correct. I just wanted to make sure that you were aware of that, Your Honor. Correct. The best case that plaintiffs were able to point to in response to the court's questions was Park v. Reliance. Park v. Reliance is a case in the Eighth Circuit in which that court ultimately said, in sum, we hold that an award of interest on wrongfully delayed benefits remain permissible. Pre-judgment interest, which does that fit under? A1B or A3B? A1B. That is a matter of text. It's available under A1B. What language, what terms allow that? Quantifying what the value of the benefit is that the participant is entitled to under the terms of the plan. Cover benefits due to him? Correct. But the plan doesn't say anything about pre-judgment interest, does it? No, it does not. But when you're paying somebody benefits that should have been paid to them sometime prior, it's part of that concept, part of the pre-judgment interest concept that infects every ERISA case and every other kind of cases that paying somebody a dollar today is not like paying them a dollar yesterday. Are the cases uniform about this point, that benefits includes pre-judgment interest? The courts almost universally say that pre-judgment interest is available under 1132 A1B. In the Eighth Circuit, they say pre-judgment interest is available under A3 instead of A1B. That's the Park case. But what's notable is that all of the courts in the Eighth Circuit now apply the post-judgment interest rate in determining what that rate is supposed to be. There is no discussion of disgorgement of profits. There is no discussion of what the defendant's profits are in those circumstances at all. But Park very specifically said that, didn't he? I'm sorry? Didn't Park very specifically discuss A3 and say that this is an issue of where a defendant who owes a fiduciary duty to a plaintiff may be forced to disgorge any profits made by breaching that duty? They went through that discussion under A3, Your Honor, but then concluded by saying that's why we find that pre-judgment interest is available. Called it both, didn't it? Well, the conclusion, I think, was that it was pre-judgment interest that they were awarding, and that's what the courts in the Eighth Circuit have universally said that the Eighth Circuit meant in Park when it said what it is that it said. So you treat it as a part of an A1B remedy that is a discretionary right of a district court to award? Correct. Your Honors, I want to address one other point, which is this suggestion that there was an inordinate delay here. What you have is a lawsuit that was filed in 2004 after an original claim for benefits was made in approximately the middle of 2002, and the district court summary judgment ruling was in the middle of 2005. There was no extraordinary delay here. There was nothing more than a regular, commonplace, routine denial of benefits based on the administrative record. The only unusual thing about this case is the amount of the benefits at issue because of the salary of the individual, and Judge White, counsel, was correct that this was an unfunded welfare plan for the benefit of multiple employees. Under ERISA, there can be funded plans that have trusts where there are trust assets, and then there are unfunded plans like severance plans and like insured benefit plans and like a lot of medical benefit plans where there is no trust. There is no trustee as such. There are fiduciaries, but that's about the extent of it. And when was the $900,000 paid? The $900,000 was paid in approximately 2008 because after this court initially, when the appeal was filed, there was a supersedious bond posted in response to the plaintiff's request for a supersedious bond and or for payment of some certain dollars, which was well less than the $900,000. And then after the case was affirmed by this court, back in the district court, Lina paid some of those amounts of money. There were disputes about some of the other amounts, and that ultimately was paid in 2008. Thank you, counsel. Thank you very much, Your Honor. The case will be submitted.